UNITED STATES, Appellee,

v.

Gary V. McGRANER, Technical Sergeant
U. S. Air Force, Appellant.

No. 37,849.
ACM S24687.

U. S. Court of Military Appeals.

Aug. 2, 1982.

For Appellant: *Captain Patrick A. Tucker* (argued); *Colonel Larry G. Stephens* (on brief).

For Appellee: *Major Robert T. Mounts* (argued); *Colonel James P. Porter* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

On September 14–16, 1978, a special court-martial with members tried appellant at Ramstein Air Base, Germany, on charges that he possessed amphetamine contrary to an Air Force Regulation, and wrongfully possessed, used, transferred, and sold marihuana.[1] Pursuant to his pleas of guilty, McGraner was convicted on all charges and specifications and then was sentenced to a bad-conduct discharge and reduction to the grade of airman basic. Following the approval of his conviction by all intermediate reviewing authorities, we granted review of this single issue:

> WHETHER THE MILITARY JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT, WHEN HE HELD THE APPELLANT HAD NO STANDING TO OBJECT TO A VIOLATION OF THE TIME STANDARDS IN AIR FORCE MANUAL 111–1 RELATIVE TO THE SPEEDY DISPOSITION OF THE CHARGES AGAINST HIM.

I

On February 10, 1978, an investigation had focused on McGraner, when a supposed friend, who was working as an informant for the Air Force Office of Special Investigations (AFOSI), turned over to a special agent a "small tinfoil packet" containing a "brown vegetable substance," which McGraner had just given him. Two weeks later, McGraner invited the informant to his residence and smoked "hashish" in his presence. He also gave the informant another "tinfoil packet and brown vegetable substance," which the informant eventually relinquished to the OSI. On February 27, appellant sold the informant a "brown chunk of vegetable substance in ... [a] match box"; once again the informant gave the evidence to the OSI and reported his observations concerning the transaction. Finally, on March 9, the informant accompanied McGraner home and appellant "went over to a nightstand [in a bedroom] and took out the wax paper packet and white powder substance," which apparently was amphetamine. The informant also observed in the bedroom "a piece of vegetable substance, which, based upon his experience, appeared to be hashish, in a tobacco tin."

On the morning of March 10, the OSI related this information to the Base Commander and, in turn, obtained authorization to search appellant's residence for contraband. Later that morning, OSI agents conducted the search and seized a "chunk of brown vegetable substance," a "wax paper packet and white powder substance," and copious drug paraphernalia. The two substances were eventually identified by the laboratory as marihuana and amphetamine. Thus, the last drug offenses had been committed by McGraner on March 10, 1978, when the special agents found marihuana and amphetamine in his residence. On that same date appellant was apprehended by the "security police at the request of the OSI"; but apparently he was released from custody almost immediately, for the record of trial reflects no pretrial restraint.

By March 13, the informant had furnished the OSI his final written statements concerning appellant's drug violations. On March 15, by reason of the information he had received, McGraner's unit commander had decided to prefer charges against him.

---

1. The amphetamine offenses were charged as violations of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892, and the marihuana offenses were prosecuted under Article 134, UCMJ, 10 U.S.C. § 934. After appellant's guilty pleas were accepted by the court, trial counsel, with permission of the convening authority, withdrew the specification that alleged the sale of amphetamine.

However, charges were not preferred until June 30—107 days later. In turn, the convening authority did not refer the charges for trial until August 4—142 days after appellant's commander had decided to court-martial him.

On that date the military judge promptly scheduled the trial for August 17. Because of his own caseload, defense counsel then requested that the trial be delayed until August 31, and the judge granted the two-week continuance. Subsequently, defense counsel again requested the judge to delay the trial for two more weeks in order to prepare appellant's defense. Even though the Government opposed any further delay of the trial, the court acceded to defense counsel's request, so appellant's trial began on September 14, 1978.

When trial commenced, defense counsel undertook a short *voir dire* of the military judge to determine whether to challenge him for cause. Apparently, the judge recently had ruled in another case on a motion that concerned the timely processing of charges and, because defense counsel

planned to make a similar motion in appellant's case, he wished to assure that the judge could approach the issue with an open mind.[2] Satisfied by the judge's answers upon voir dire, the defense offered no challenge for cause.

Initially defense counsel moved to dismiss all the charges for failure of the Government to comply with Air Force Manual (AFM) 111–1, Military Justice Guide, which, *inter alia*, prescribed time standards for the processing of court-martial charges. In this regard he relied particularly on paragraph 1–3(b) which provided:

Charges should be preferred as soon as possible after it has been ascertained that an offense is of such serious nature as to warrant disposition by trial by court-martial; normally, within three days. The following time standards should be observed:

\* \* \* \* \* \*

[A list of time for each action in various types of courts-martial was set out.[3]]

2. The background for defense counsel's concern is indicated by this portion of the voir dire:

DC: Maybe this will clarify it a little bit, your Honor. What the defense is interested in is not so much what are the actual facts pertaining to those particular cases that were involved or what may, in fact, be, but what you may have received could be important as to whether or not you have formed any opinions or impressions, particularly along the lines as to whether or not you would feel that your job would be in jeopardy as a military judge in making any type of ruling or any other way that might influence you to make a decision one way or the other. And you may be able to handle that very generally, your Honor, by saying the facts you have heard, whether they're true or not, have they led you to any impression or opinion that your job could be affected here in the Sixth Circuit based upon a ruling, particularly if it was a ruling against the United States Government.
MJ: There's certainly been some evidence raised to suggest that that might be the case, and by that evidence I mean the fact that another judge, I understand, was brought in TDY from the United States to try cases because the convening authority was alleged to have been dissatisfied with Colonel Morrison's cases or his decisions, and I understand that no cases were referred to trial for a great period of time.

DC: Did you ever see a particular message that was sent from Headquarters USAFE or are you aware of any particular message that may have been sent from Headquarters USAFE pertaining to the appointment of that judge coming from the United States and discussing whether or not one particular judge would not be put on orders?
MJ: No, I have not, but I do know, or I have heard from a fellow judge, that he was under the belief that he had been put on orders to cases, that would be Judge Stephenson, and yet found out much to his surprise after he had granted some motions for continuances and things of this matter, found out much to his surprise that the other judge who had been brought over TDY, Colonel Bloss, was to be used as the judge in those cases.

3. The time standards for "Special Courts-Martial Involving Bad-Conduct Discharge," as did McGraner's court-martial, are these:

| | Cumulative Elapsed Days |
|---|---|
| Accused restricted, arrested, or confined by military authority _ _ _ _ | 0* |
| Charges preferred (date of affidavit) _ _ _ | 3 |
| Charges referred for trial _ _ _ _ _ _ _ _ _ | 8 |
| Net elapsed days to sentence or acquittal _ _ _ _ _ _ _ _ _ _ _ _ | 20 |
| Action by convening authority (if other than GCM authority). Includes time to prepare and attach papers under para 48k(3), MCM, 1969 (Rev.) | 45 |
| Action by GCM authority *** _ _ _ _ _ _ | 66** |

Trial counsel replied that these provisions of the Manual were "not designed to benefit the accused, but, instead, . . . [were] designed to assist the Government and those individuals in the Government, particularly the United States Air Force, in transacting their military justice business." Therefore, he argued that appellant had no standing to assert a violation of the standards for processing charges. Furthermore, he argued that the language of AFM 111–1 was only precatory and he noted that on June 26—four days before the charges were preferred against appellant—an amendment had been made to the AFM which explicitly rejected any interpretation that "rights or benefits" were bestowed on any accused because of failure to meet the time processing goals set out in AFM 111–1. *See United States v. Sirles,* 9 M.J. 773, 775 (A.F.C.M.R.1980). The amendment added this language to paragraph 1–3(b):

B(3) (added). There is no legal or regulatory requirement that the goals be met in every case or with respect to any

Para. 1–3b(3) of AFM 111–1, *supra.* The single asterisk directs the reader to this note, which is pertinent in appellant's case:

When accused is not restricted, arrested, or confined, or is restricted or confined under sentence of court-martial or restricted or in correctional custody as nonjudicial punishment when the charges are preferred, use the date the charges are preferred (affidavit) as the zero date.

4. The message change (MSG 261630Z June 78) was admitted as Appellate Exhibit III. These are the remaining revisions to AFM 111–1:

SUBJECT: AFM 111–1
Part I. The time periods mentioned in the subject manual and denominated as standards were and are intended to be regarded as goals that all should strive to attain. Moreover, when responsible personnel are advised in the Manual that they should take actions as soon as possible it was and is the intent of the Manual to stress that it is desirable that the actions occur as early as is appropriate under the existing circumstances. In sum, these administratively established time standards did not and do not set limits or inflexible boundaries designed to have legal consequences in the disposition of cases.
Part II. In the interest of clarity, the following interim change to the subject Manual is made:

particular event among the milestones used for measurement. No rights or benefits are created for any party to a court-martial solely because the processing time goals are not met in any case or with respect to any stage of the proceedings. Likewise, no penalty or limitation is incurred as a result of failure to meet the goals in an individual case, so long as controlling principles otherwise imposed by law are not violated.

Moreover, the amendment eliminated any specific number of days within which charges had to be preferred by a commander, for it directed: [4]

C. The first two sentences of para 1–3b are changed to read:

Charges should be preferred as soon as practicable after the responsible commander decides that an offense is so serious that it warrants trial by court-martial. In processing the charges and other actions related to the case, seek to achieve the following goals to the greatest extent feasible:

A. Para 1–3a(2), AFM 111–1 is changed to read as follows:
A.(2). Air Force Goals for court-martial processing time are separate from the overriding strictures noted in (1) above: They address the proposition that all military justice matters should move expeditiously regardless of whether the accused is in confinement. The amount of time required to process each case depends on all the factors involved in that particular case; thus, in some cases it will be impossible or impracticable to achieve specific goals for processing times. Nevertheless, the goals are intended to assist in expeditious disposition of charges without sacrificing thoroughness and fairness for speed. They provide a useful device for managers and supervisors to measure the time required to process courts-martial and to insure that cases are not delayed to the point that mandatory legal standards (such as those noted in (1) above) are not met. Subparagraph b states the goals that one should seek to reach in processing courts-martial within the Air Force. It should be practicable to complete each stage of a court-martial within the stated time goal in a large majority of cases.

\* \* \* \* \* \*

D. Make the following pen and ink changes:
1. Para 1–3c, first line, change "standard" to "goal."
2. Para 1–3d, second line, change "standard" to "goal."

The military judge took the view that even before the amendment, AFM 111–1 "confer[red] no benefit upon the accused and he had no standing to raise that regulation," so it was immaterial whether the amendment applied to appellant's case. Thus, he denied the defense motion predicated on violation of this Manual.

Next, defense counsel moved to dismiss the charges for failure to comply with paragraph 25 of the Manual for Courts-Martial, United States, 1969 (Revised edition), which states: "When it is intended to prefer charges, they should be preferred without unnecessary delay." In this regard, defense counsel relied on the delay of more than 100 days between the time that appellant's unit commander determined to prefer charges and the time when charges were actually preferred.

To explain the delay the Government relied on a "Chronology of Pretrial Processing" (Appellate Exhibit IV), as to which defense counsel stated that he had "no particular objection as to the facts, as to the dates and information relayed in" the exhibit. Among other things, the chronology indicated that the informant had been involved in several ongoing investigations and that he had not been "surfaced" by the OSI until mid-May of 1978. Moreover, the final laboratory report from the United States Army Criminal Investigations Laboratory had not been received by the OSI until June of 1978; one of the OSI final investigative reports did not become available to the base legal office at Ramstein until mid-June; and the charges were then processed by that office from mid-June until they were preferred on June 30. The chief of military justice at Ramstein testified that, as his office was processing the charges, they found a problem with one of the laboratory reports and so had to await a supplemental report. Also, his office spent "a substantial period of time" reviewing the evidence, since "it was difficult to determine which items of evidence referred to on the lab reports, which of these items ... [corresponded] with items seized by the OSI." Furthermore, the member of his staff who was primarily responsible for processing the charges also was "involved quite heavily in legal assistance ...; she had other military justice duties."

Ultimately, the judge denied the motion because he found that there was "not an unnecessary delay." The military judge also denied a defense motion to dismiss the charges because of denial of appellant's right to a speedy trial.

Finally, the judge considered a defense motion to dismiss the charges for failure to comply with Article 30(b) of the Uniform Code of Military Justice, 10 U.S.C. § 830(b), which directs:

> Upon the preferring of charges, the proper authority shall take immediate steps to determine what disposition should be made thereof in the interest of justice and discipline, and the person accused shall be informed of the charges against him as soon as practicable.

In that connection, the defense argued that the convening authority and his staff judge advocate had intentionally delayed referral of the charges as a means of forum shopping. The theme of the defense motion was that, because trial judges had ruled for the defense on motions to dismiss in other cases where violations of AFM 111–1 had been claimed, the convening authority had decided to delay referring appellant's case for trial. Presumably, the logic of such delay would be that AFM 111–1 might be amended—as indeed occurred on June 26, 1978; that—as later occurred [5]—the Government might succeed in its effort to obtain extraordinary relief from the Air Force Court of Military Review, see Dettinger v. United States, 6 M.J. 505 (1978), rev'd, 7 M.J. 216 (C.M.A.1979); or that different judges would be ruling on the issue—as, indeed, took place in appellant's case.

The convening authority was called as a witness and testified at length about the

---

5. See United States v. Dettinger, 6 M.J. 505 (A.F.C.M.R.1978), which held that the trial judges had exceeded their power, but which subsequently was reversed by our Court in Dettinger v. United States, 7 M.J. 216 (C.M.A. 1979).

reasons that had prompted him to delay referring the case for trial. He confirmed that he had discussed with the chief of military justice at Ramstein and with the staff judge advocate at Headquarters, United States Air Forces in Europe, the rulings that had been made at the trial level in the *Dettinger* case and in similar cases tried at Ramstein. The convening authority stated that he believed these decisions were erroneous but that there had been no discussion or decision about not referring cases to the military judges who had made the adverse rulings in those cases. The convening authority explained his delay in referring McGraner's case to trial in this way:

> It was a very important case and with a great deal of implications and when I had read 111–1 and reviewed the results of the previous decisions, it was very apparent that the judge had made a mistake. He was looking at a situation where he interpreted a regulation that was a management regulation, that particular portion, as conferring rights on the defendant; and I disagreed with that. I knew that the decision would be appealed and in the process that we were going to have some degree of delay. There was also an indication at that particular time that the Air Staff JA would come out with some additional guidance.

Finally, on August 4, the convening authority decided to refer the case for trial because

> we had gotten to the point where the expected clarification of the one letter that came from USAF/JA that attempted to clarify the intent of 111–1, the discussions with the JA, my judge advocate's people, and the thought processes it didn't look like the Air Staff was going to further clarify 111–1; and with due regard for processing within a speedy sequence of events, we made the decision at that particular time. I made the decision at that particular time, with the advice of my JA to go to trial.

In response to a specific question from the military judge the convening authority denied emphatically "that a portion of . . . [his] motivation in the timing of the referral of this case was to select the forum of the judge before which it came."

The military judge also denied this motion to dismiss. While rejecting a defense request that he make special findings, he stated, "I believe that Article 30(b) does apply; and I believe given the facts and circumstances that the convening authority acted as soon as he could; that he did act immediately given the facts and circumstances which he has related were known to him and the concerns that he had."

## II

■ Whether tried by civilian court or by court-martial, an accused has a constitutional right to a speedy trial. U.S.Const. amend. VI. However, this right only applies after an indictment is filed or charges are preferred. *See United States v. Mac-Donald,* —— U.S. ——, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982); *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The right to a speedy trial does not "require the Government to discover, investigate, and accuse any person within any particular period of time." *United States v. Marion, supra* at 313, 92 S.Ct. at 459. *See Barker v. Wingo,* 407 U.S. 514, 523, 92 S.Ct. 2182, 2188, 33 L.Ed.2d 101 (1972). Indeed, "[t]o recognize a general speedy trial right commencing as of the time arrest or charging was possible would have unfortunate consequences for the operation of the criminal justice system." *United States v. Marion, supra* 404 U.S. at 321 n.13, 92 S.Ct. at 463 n.13.

Under some circumstances extensive delay in preferring charges might justify a due-process claim by an accused;[6] but clearly such situations are very unusual. Indeed, as the Supreme Court made clear in

---

**6.** *See United States v. Marion,* 404 U.S. 307, 315 n.8, 92 S.Ct. 455, 460 n.8, 30 L.Ed.2d 468 (1971). Also, some cases from the District of Columbia Circuit have given relief for such delays on the basis of "the Court of Appeals' purported supervisory jurisdiction." *Id.*

*United States v. Lovasco, supra,* haste in initiating prosecutions may sometimes offend due process, for:

It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself," *United States v. Ewell, supra,* [383 U.S. 116] at 120, 15 L.Ed.2d 627, 86 S.Ct. 773 [at 776]. From the perspective of potential ·defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in *Marion,* a formal accusation may "interfere with the defendant's liberty, ... disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him; his family and his friends." 404 U.S., at 320, 30 L.Ed.2d 468, 92 S.Ct. 455. From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts.

*Id.* at 790–92, 97 S.Ct. at 2048–49 (footnotes omitted).

Accordingly, as the Supreme Court concluded in *Lovasco* :

We would be most reluctant to adopt a rule which would have these consequences absent a clear constitutional command to do so. We can find no such command in the Due Process Clause of the Fifth Amendment. * * * Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," *Smith v. United States,* 360 U.S. 1, 10, 79 S.Ct. 991, [997], 3 L.Ed.2d 1041 (1959). This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.

*Id.* at 795–96, 97 S.Ct. at 2051–2052.

Of course, in defining the rights of military personnel, Congress was not limited to the minimum requirements established by the Constitution, and in many instances, it has provided safeguards unparalleled in the civilian sector. *See, e.g.,* Articles 31 and 38(b), UCMJ, 10 U.S.C. §§ 831 and 838(b), respectively. Our ruling in *United States v. Burton,* 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971)—which requires dismissal of charges after ninety days of pretrial confinement without satisfactory explanation by the Government—is predicated on the premise that the Uniform Code of Military Justice offers safeguards concerning pretrial confinement that were not constitutionally required. *See, e.g.,* Articles 10, 33 and 98, UCMJ, 10 U.S.C. §§ 810, 833, and 898, respectively. Furthermore, either the President in promulgating the Manual for Courts-Martial or the Armed Services by

adopting regulations can go even further than the Constitution and the Uniform Code in providing safeguards for military personnel. Thus, in *United States v. Dunks*, 1 M.J. 254 (C.M.A.1976), the Court enforced the requirements of a regulation promulgated by the United States Army in Europe whereunder certain delays after preferral of charges or referral of charges for trial would warrant dismissal upon written application to the general court-martial convening authority.

■ We must emphasize, however, that not every regulation which deals with the administration of justice or with investigative procedures is designed to create rights enforceable by the accused when he is brought to trial. This point was emphasized by the Supreme Court in *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), which refused to exclude evidence because it had been obtained in violation of Internal Revenue Service (IRS) regulations forbidding even consensual electronic surveillance of conversations between a taxpayer and an IRS agent, unless appropriate advance authorization had been secured. The regulations had been promulgated in order to conform IRS practice to procedures established by the Attorney General in a Memorandum to the Heads of Executive Departments and Agencies. Under the agency's regulations the Director of the Internal Security Division or the Assistant Commissioner (Inspections) of IRS was empowered to authorize the monitoring of non-telephonic conversations on occasions of emergency; but advance approval had to be obtained from the Department of Justice if at least 48 hours were available in which to do so.

While performing a tax audit, an IRS agent wore a hidden radio transmitter which allowed other agents to monitor and record three face-to-face conversations during which Caceres had attempted to bribe the agent. This electronic surveillance had taken place on the basis of emergency approval, because less than 48 hours had been available to secure authorization from the Department of Justice. However, in the subsequent criminal proceedings, "the [lower] courts concluded that ... the emergency provision of the regulations" was not properly invoked "because the exigencies were the product of 'government-created scheduling problems.'" 440 U.S. at 749, 99 S.Ct. at 1470 (footnote omitted). Accordingly, the District Court granted a motion to suppress evidence concerning the monitored conversations and the Court of Appeals affirmed this ruling. Reversing the courts below, the Supreme Court held that the tape recordings and the testimony of the agents who monitored the conversations could be admitted despite violation of the IRS regulations. Distinguishing cases where enforcement of regulations had been granted pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* and 701, *et seq.*, the Court emphasized:

> But this is not an APA case, and the remedy sought is not invalidation of the agency action. Rather, we are dealing with a criminal prosecution in which respondent seeks judicial enforcement of the agency regulations by means of the exclusionary rule. That rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial. In view of our conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.

440 U.S. at 754–55, 99 S.Ct. at 1472–1473 (footnotes omitted).

The Supreme Court also differentiated certain other situations where an agency regulation had been enforced by the courts. For example, *Caceres* was not a case in which a regulation must be judicially enforced because "compliance with the regulation is mandated by the Constitution or

federal law." [7] Likewise, nonenforcement of the IRS regulation did not violate equal protection requirements—in which connection the Court noted that an executive agency's misconstruction of "its own regulations surely does not raise any constitutional questions." *Id.* at 752, 99 S.Ct. at 1471.

Furthermore, the Supreme Court emphasized that *Caceres* was not "a case in which the Due Process Clause is implicated because an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *Id.* at 752–53, 99 S.Ct. at 1471–1472 (footnote omitted). In this regard, the Court distinguished *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), which "held that due process precluded the conviction of individuals for refusing to answer questions asked by a state investigating commission which itself had erroneously provided assurances, express or implied, that the defendants had a privilege under state law to refuse to answer," and *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), which ruled "that an individual could not be punished for demonstrating 'near' a courthouse where the highest police officials of the city had advised the demonstrators that they could meet where they did without violating the statutory proscription against demonstrations 'near' the courthouse." 440 U.S. at 753 n.15, 99 S.Ct. at 1472 n.15.

Of course, the Supreme Court emphasized in *Caceres* that, even though the IRS regulations were not constitutionally required,

[i]t does not necessarily follow, however, as a matter of either logic or law, that the agency had no duty to obey them. "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270.

440 U.S., at 751 n.14, 99 S.Ct., at 1471 n.14.[8]

Although *Caceres* involved a criminal prosecution in which the defendant sought "judicial enforcement of the agency regulations by means of the exclusionary rule," *id.* at 754, 99 S.Ct. at 1472, its analysis has been applied in other instances where an individual has sought redress based upon asserted failures of an agency to follow its own regulations. Thus, in *United States v. Cormier*, 639 F.2d 1177 (5th Cir. 1981), where the Social Security Administration allegedly had violated its internal regulations by instituting criminal action against Cormier without first affording her an informal review, the Court of Appeals held "that . . . [the] violation did not require dismissal of the charge," because "neither the Constitution nor statute mandates compliance with the . . . regulations." Moreover, her due-process rights had not been violated, since she did not rely on the regulations or "claim . . . that its breach affected her conduct." *Id.* at 1180. In *United States v. Renfro*, 620 F.2d 569, 574 (6th Cir. 1980), *cert. denied*, 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980), the court held that the defendant had no standing to invoke the Justice Department's *Petite* policy[9] in seeking dis-

---

**7.** Thus, in *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), the Court had invalidated "a deportation [which had been] ordered on the basis of statements which did not comply with" rules of the Immigration Service "designed 'to afford [the alien] due process of law' by providing 'safeguards against essentially unfair procedures.'" *United States v. Caceres*, 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979) (footnote omitted).

**8.** The Supreme Court also made the point that by granting individuals standing to enforce regulations, courts may deter agencies from pro-

mulgating regulations to protect individual rights. *Id.* 440 U.S. at 756, 99 S.Ct. at 1474. Some evidence of the accuracy of this observation is provided by the Air Force amendments to AFM 111–1.

**9.** As noted in *United States v. Renfro*, 620 F.2d 569, 573 n.2 (6th Cir. 1980), *cert. denied*, 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 243 (1980):

The *Petite* policy derives its name from *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) in which the Supreme Court reversed a District Court order denying the government's motion to dismiss

missal of his indictment, since that "policy 'is not constitutionally mandated.' " *United States v. Meier*, 607 F.2d 215, 217 (8th Cir. 1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1658, 64 L.Ed.2d 243 (1980), held that, "[e]ven if … [IRS] regulations were violated" by the failure of an agent to refer the matter to the Criminal Division at an earlier date, "Meier's constitutional rights were not affected"; and he neither "relied upon the regulation" nor claimed "that its violation affected his conduct." *See United States v. Choate*, 619 F.2d 21, 23 (9th Cir. 1980), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980); *United States v. Wilson*, 614 F.2d 1224, 1227–28 (9th Cir. 1980); *cf. Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).

### III

■ Against this background we turn to the issue granted in the case at hand. First, we observe that, unlike the USAR-EUR Regulation which was the subject of *United States v. Dunks, supra*, AFM 111–1 does not purport to grant an accused any remedy of seeking dismissal of charges because of the Government's failure to meet time standards. While there is reference in this Manual to the risk that delay may lead to dismissal under the rules announced in cases like *United States v. Burton, supra*, AFM 111–1 does not purport to enhance that risk by authorizing automatic dismissal because of noncompliance with its time standards for processing. To the contrary, the Manual only prescribes norms for prompt processing to help avoid claims of unnecessary delay and resultant dismissal.

Secondly, our consideration of AFM 111–1 persuades us that the time standards were prescribed primarily for "management" purposes, rather than to protect the rights of accused persons. In *Barker v. Wingo, supra*, 407 U.S. at 521, 92 S.Ct. at 2187, the Supreme Court remarked:

> an indictment where the defendant had been convicted for the same offense in a state court. The *Petite* policy was established by Attorney General William Rogers in 1959 and has been followed with some minor changes ever since. Briefly stated the policy provides:

A second difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself.

Thus, the public also has a concern with and interest in the prompt trial of criminal cases. Accordingly, it is especially plausible that a regulation on this subject would not be directed to establishing new rights for an accused but instead would have the goal of avoiding delay which hindered prosecution, as witnesses disappeared or their memories faded. Indeed, to construe AFM 111–1 as creating no judicially enforceable individual rights seems easier than to give such an interpretation to an agency regulation concerning rights of privacy—as the Supreme Court did in *Caceres*.

Thirdly, we observe that in *Caceres* the Supreme Court refused to allow the IRS regulation to be invoked as the basis for excluding relevant evidence. In the case at bar, the consequences of enforcing AFM 111–1, as appellant urges us to do, would be dismissal of the charges—a more drastic remedy, which the Supreme Court has made clear is to be invoked only sparingly. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 664, 66 L.Ed.2d 564 (1981).

Finally, AFM 111–1 does not present any of the distinguishing features which the

> No Federal case should be tried when there has been a State prosecution for substantially the same act or acts without a recommendation having been made [to and approved by] the Assistant Attorney General demonstrating compelling Federal interests for such prosecution.

**418**

Supreme Court indicated might have led to a different outcome in *Caceres*. McGraner relied in no way on that Manual's time standards. Moreover, these guidelines were not promulgated in order to implement McGraner's speedy trial or due process rights[10] or to provide specificity to some general standard contained in the Constitution, the Uniform Code, or the Manual for Courts-Martial.

We recognize that McGraner did not receive the same favorable application of AFM 111–1 that some other airmen enjoyed at the hands of different military judges. *See Dettinger v. United States, supra.* However, just as the misconstruction of the IRS regulation in *Caceres* did not rise to the level of an equal protection violation, we are convinced that McGraner also was not deprived of equal protection. After all, intentional and purposeful discrimination is usually a prerequisite for successful assertion of such a claim. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). Moreover, equal protection is not denied when there is a reasonable basis for a difference in treatment. *United States v. Means*, 10 M.J. 162 (C.M.A.1981). We find such a basis for differentiating appellant's case—where the judge refused to find "unnecessary delay" in preferring charges and where the chronology of events provides ample basis for that finding—from the cases we dealt with in *Dettinger*—where we expressly noted:

> After a hearing on the matter, the trial judge in *Dettinger* determined that the Government's delay was "unnecessary" and for a reason inconsistent with the Air Force Manual and "contrary to public policy." In *Wingard*, the trial judge, also after a hearing, determined that various

periods of delay were "lengthy," "unexplained," and in violation of the Manual. The judge further noted that not every failure by the Government to comply with the Manual "required" dismissal of the charges, but he concluded that, in the case presented, dismissal was "the only appropriate remedy." The Court of Military Review did not question the judges' findings; it denied only that they had any right to dismiss the charges.

7 M.J. at 224 (footnote omitted).

## IV

Although we have concluded, in line with *Caceres*, that appellant lacked standing to seek dismissal because of alleged noncompliance with the time standards prescribed by AFM 111–1 for processing charges, the delay between preferring the charges against McGraner and referring them for trial gives us special concern. If this had taken place as part of a plan to substitute for appellant's trial a military judge from whom a more favorable ruling was expected by the Government, it would be indefensible—from the standpoint of the Constitution and the Code. However, the convening authority emphatically and forthrightly denied that this was his motivation and the trial judge apparently credited his testimony. The purported reason for the delay—to allow the Government to seek review of a ruling believed in good faith to be erroneous—is not illegal. *United States v. Herman*, 576 F.2d 1139, 1145–47 (5th Cir. 1978); *United States v. Jackson*, 508 F.2d 1001, 1004–05 (7th Cir. 1975); *United States v. Bishton*, 463 F.2d 887, 890 (D.C.Cir.1972). *See also United States v. Osuna-Sanchez*, 446 F.2d 566 (9th Cir. 1971), *cert. denied*, 404 U.S. 1022, 92 S.Ct. 698, 30 L.Ed.2d 672 (1972). *Cf. United States v. Canales*, 573 F.2d 908, 910 (5th Cir. 1978). Certainly a trial cannot be delayed indefinitely for this purpose. However, McGran-

10. As the judge apparently concluded—and as recent Supreme Court cases have made obvious—appellant's constitutional rights to speedy trial and due process did not come into play here until after charges had been preferred on June 30. *See United States v. MacDonald*, — U.S. —, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982); *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion, supra.*

er concededly did not undergo "pretrial restraint of any nature"; the delay in referring the case was not inordinate; and there is no indication of prejudice to appellant in his defense; [11] therefore, we find no basis for relief in this case.

V

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

11. McGraner's defense counsel conceded that the delays in preferring the charges and referring them for trial had not specifically prejudiced his client.