UNITED STATES, Appellee,

v.

Jeffrey R. JOHNSON, Private (E–1),
U.S. Army, Appellant.

No. 45,550.

CM 442412.

U.S. Court of Military Appeals.

March 12, 1984.

For Appellant: *Captain Frank J. DiGiammarino* (argued); *Colonel William G. Eckhardt, Major Robert C. Rhodes, Captain Michael T. Kelly* (on brief).

For Appellee: *Captain Patrick J. Cunningham* (argued); *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Captain Glenn D. Gillett,* and *Captain David A. Brown* (on brief); *Lieutenant Colonel Thomas M. Curtis.*

*Opinion of the Court*

COOK, Judge:

Pursuant to his pleas, the accused was convicted by general court-martial, military judge alone, of possessing and transferring heroin, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a dishonorable discharge, confinement at hard labor for 2 years, forfeiture of all pay and allowances, and reduction to Private (E–1). In accordance with a pretrial agreement, the convening authority reduced the period of confinement to 20 months and approved the remainder of the sentence. The United States Army Court of Military Review affirmed in a short-form opinion. We granted the accused's petition for review of the following issue:

WHETHER THE APPELLANT WAS
DENIED HIS CONSTITUTIONAL
RIGHT TO A SPEEDY TRIAL?

We decide here that he was not and affirm.

The factual background upon which the charge was based concerns a single incident of drug transfer. On or about October 8, 1980, the accused was solicited by Specialist

Dennis to sell the latter heroin. Although the accused did not possess any heroin at the time, he agreed to attempt to get some for Dennis. Shortly thereafter, the accused obtained some heroin from an unknown German national in Nuremberg, Germany, and he then transferred the heroin to Dennis. It was understood that Dennis would pay the accused on the next payday. On October 12, 1980, Dennis' body was found in his apartment and it was determined that he had been dead for some 4 to 5 days. Although the cause of death could not be conclusively determined, the possibility of heroin overdose could not be ruled out.[1] On January 8, 1981, an investigation conducted by the Army Criminal Investigation Division (CID) revealed that the accused might have sold heroin to Dennis prior to his death. On April 15, 1981, the accused was interviewed by CID agents and advised that he was suspected of involuntary manslaughter; possessing, selling, using and transferring heroin; and possessing, selling, using, and transferring hashish and marihuana. At that interview, the accused admitted the events of the heroin sale to Dennis, but denied being with Dennis when he took the heroin. On the same date, the accused was restricted to the company area and the restriction remained in effect until May 7, 1981. On May 18, 1981, charges of wrongful possession and transfer of heroin, and involuntary manslaughter were preferred.

The chronology of essential dates after the preferral of charges is as follows:[2]

June 11, 1981: An investigating officer was appointed to conduct an Article 32 investigation.

June 17, 1981: The accused requested immediate trial.

June 18, 1981: The Government responded that the case was being investigated and would presently move into the pretrial investigation stage.

June 23, 1981: The Article 32 investigating officer was informed of his appoint-

ment. (Apparently the delay in informing the Article 32 officer was because the investigating officers were generally appointed from a unit which was often in the field and there were difficulties encountered in contacting the appointed officers.)

June 24, 1981: The investigating officer picked up his packet.

June 29, 1981: The investigating officer discussed this case with his legal advisor.

July 3, 1981: The investigating officer set a tentative date of July 10 for the investigation. The Government subsequently requested a delay until July 24 because of scheduling conflicts.

July 21, 1981: The accused requested a delay until July 31.

Aug. 14, 1981: The Article 32 hearing was begun.

Aug. 21, 1981: The Article 32 investigation was completed. The investigating officer recommended trial by general court-martial on the charges of possession and transfer of heroin and dropping the charge of involuntary manslaughter.

Sep. 25, 1981: The regimental commander recommended trial by general court-martial on all charges, including involuntary manslaughter.

Oct. 5, 1981: The pretrial advice was completed.

Oct. 6, 1981: The general court-martial convening authority referred the charges to a general court-martial.

Oct. 9, 1981: The charges were received at appellant's unit.

Oct. 13, 1981: The accused was served.

Oct. 21, 1981: A request for a trial date was made, but due to the unavailability of an open date in November a tentative date of trial was docketed for December 6 and 7.

---

1. The allied papers indicate that the heroin Dennis ingested might have contained other substances.

2. There was no agreed chronology presented either at trial or before this Court. The dates here are taken from the record of trial and the brief of appellate government counsel.

Oct. 23, 1981: The Government requested a delay until December 14 and 15 due to the unavailability of certain witnesses.

Nov. 25, 1981: The accused requested the Government to produce three individuals as witnesses for the defense, alleging that these witnesses would be material to the charge of involuntary manslaughter and that two of the witnesses would rebut the charge of possession and transfer of heroin.

Dec. 14, 1981: The accused's trial began before a military judge sitting as a general court-martial.

At trial, the accused moved to dismiss all charges and specifications for deprivation of a speedy trial, alleging as specific "personal prejudice" that he had "been on some form of restriction for seven months"; his "ability to interview or obtain defense witnesses" had been "impaired"; he had not been able to work in his specialty area; he had not been considered for any "favorable actions . . . and he's lost any possibility of promotions" during the period; and he had "been subjected to an embarrassment because he's had to do details and menial jobs." He also asked the military judge to consider a presumption of prejudice because of the 7-month delay from the time of preferral to the time of trial.

The military judge heard evidence—largely in the form of offers of proof—on each of the allegations of prejudice. The Government stated that the accused had been restricted "to the company area" from April 15 to May 7, but, aside from that specific period, there had been "no other type of restriction, confinement or arrest of any form, manner or shape subsequent to that time or prior to that time period." The Government further offered that the request for defense witnesses was served on the Government on November 25, 1981—approximately 3 weeks before the date of trial. Upon receipt of the request, the Government sent telegrams to the last known addresses of the witnesses. Witness Flack "was a civilian, at least as of 9 Janu-

ary 1981," and a telegram sent to his home in Union Mills, North Carolina, received no response. Flack was not called at the Article 32 [3] investigation, but his name appeared in the CID report of investigation. He apparently had been interviewed in the United States by an agent from the Fort Bragg, North Carolina, district in January, 1981. Witness Ford was located at Fort Gordon, Georgia, and was, at that time, enroute to Germany to testify. The last witness, Beasley, had received an administrative discharge in October of 1980, and there had been no response to a telegram that had been sent to his last known address in Aberdeen, Maryland. Although it was not specifically stated, defense counsel indicated that the witnesses would testify "[a]s to whether the heroin obtained from the accused was the heroin ingested" by Dennis.

Other delays in processing this case occurred because of difficulties in obtaining an Article 32 investigating officer, as the unit from which these officers were selected was "in the field up at Grafenwoehr"; certain scheduling difficulties of counsel; and, ultimately, getting a trial date from the office of the military judge.

After the conclusion of these offers of proof, the Government argued that although there had been periods of delay, these periods "were not oppressive" and "they did not incur any prejudice upon the accused." In denying the motion, the military judge stated:

It does not appear clear to me what caused this delay and it does not appear clear to me that this delay was occasioned by any necessity for the government to spend a great deal of time obtaining foreign witnesses as the trial counsel has indicated. It does appear, however, that the government was moving forward somewhat faster than the pace of a turtle but somewhat less fast than the speed of a hare but moving forward nevertheless. The reasons for the government's progress are not readily clear but it ap-

**3.** Uniform Code of Military Justice, 10 U.S.C. § 832.

pears that the government in the offer of proof was nevertheless advancing the case and was not sitting on the case.

\* \* \* \* \* \*

Further, I find no prejudice to the accused as a result of the delay in this case.[4]

The concept of "speedy trial" is easier to define than to apply. As was held in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972):

> Finally, and perhaps most importantly, the right to speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate. As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial.... Thus, ... any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case:
>
> \* \* \* \* \* \*
>
> The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy.

*Id.* at 521–22, 92 S.Ct. at 2187–88 (footnotes omitted). Barker awaited trial for more than 5 years after his indictment, during which time his co-accused was tried six times for two murders. The reason for the delay was the state's desire to eliminate the co-accused's self-incrimination rights and make him available to testify against Bark-

er. Barker was not incarcerated, and apparently he was not adverse to waiting in the hope that the co-accused might eventually be acquitted. The Supreme Court's analysis of the speedy trial problem merits repeating:

> The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused. In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused. The inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system. In addition, persons released on bond for lengthy periods awaiting trial have an opportunity to commit other crimes.

*Id.,* 407 U.S. at 519, 92 S.Ct. at 2186 (footnotes omitted).

> A second difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself.

*Id.* at 521, 92 S.Ct. at 2187.

The Court identified four factors which might be used in determining whether an

---

**4.** The military judge said he only would consider, for the purpose of the motion, delays that occurred after the charges had been preferred.

*See United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. McGraner,* 13 M.J. 408 (C.M.A.1982).

accused has suffered a deprivation of his right to a speedy trial. These are: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." In explaining these four factors, which are to be balanced "on an *ad hoc* basis," the Court said:

[*Regarding length of delay*]

The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.

[*Regarding reason for the delay*]

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

[*Regarding defendant's assertion of his right to speedy trial*]

Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

[*Regarding prejudice to the defendant*]

Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if the defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Id.* at 530–32, 92 S.Ct. at 2192–93 (footnotes omitted).

In the term previous to *Barker v. Wingo, supra,* the Supreme Court, in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), concluded that pre-indictment delay would not give rise to a speedy-trial deprivation. In arriving at the conclusion that a passage of 3 years between the alleged criminal acts and the indictment did not establish that a violation of the speedy-trial right had occurred, the Court stated:

[T]he Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an "accused," an event that occurred in this case only when the appellees were indicted on April 21, 1970.

[T]he protection of the Amendment is activated only when a criminal prosecution has begun and extends only to those

persons who have been "accused" in the course of that prosecution. These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. *Id.* at 313, 92 S.Ct. at 459. The Court further held:

Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.... So viewed, it is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.

Invocation of the speedy trial provision thus need not await indictment, information, or other formal charge.... But we decline to extend the reach of the amendment to the period prior to arrest. Until this event occurs, a citizen suffers no restraints on his liberty and is not the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer. Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself. But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context. Possible prejudice is inherent in

any delay, however short; it may also weaken the Government's case.

*Id.* at 320–22, 92 S.Ct. at 463–64 (footnotes omitted).

Most recently, in *United States v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), the Court noted that "[a] literal reading of the [Sixth] Amendment suggests that this right [to a speedy trial] attaches only when a formal criminal charge is instituted and a criminal prosecution begins." *Id.* at 6, 102 S.Ct. at 1501. However, the Court noted:

In addition to the period after indictment, the period between arrest and indictment must be considered in evaluating a Speedy Trial Clause claim. [Citation omitted.] Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment [citation omitted], or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending.

\*       \*       \*       \*       \*       \*

The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*Id.* at 7–8, 102 S.Ct. at 1501–1502.

Our own cases largely have tracked the Supreme Court precedents. In *United States v. Amundson,* 23 U.S.C.M.A. 308, 49 C.M.R. 598 (1975), we focused on the effect of a delay on an accused who was not in confinement. Judge Quinn, writing for the majority, said:

An accused anxious to see the end of the proceedings against him might view the

time taken by this officer for the pretrial advice as longer than necessary, but viewed from the standpoint of a detached and impartial person, it does not appear unreasonable for a case in which the accused is under no limitation on his personal freedom and is engaged in his regular work.

*Id.* at 313, 49 C.M.R. at 603. In conclusion, Judge Quinn noted:

> Accused's final challenge is predicated upon alleged prejudice to him, resulting from the total time required to bring him to trial. The specific factors of prejudice are those considered in connection with determination of the beginning date of the period of the Government's accountability, that is, deprivation of the right to purchase at the exchange and commissary, denial of leave, denial of assignment to special off-base details, separation from his family, and loss of the right of reemployment with his former civilian employer.

> In any event, the Government was not bound to conform the progress of the court-martial proceedings to the time schedule of a private contractual right of the accused, especially in the absence of evidence to indicate it was aware of that right.

*Id.* at 313–14, 49 C.M.R. at 603–04.

In *United States v. McGraner,* 13 M.J. 408 (C.M.A.1982), we recognized that "[t]he right to a speedy trial does not 'require the Government to discover, investigate, and accuse any person within any particular period of time.'" *Id.* at 413, *quoting United States v. Marion,* 404 U.S. *supra* at 313, 92 S.Ct. at 459. Finding no "pretrial restraint of any nature," and no "inordinate" "delay in referring the case," we concluded that "there . . . [was] no indication of prejudice

to appellant in his defense," and thus no basis for relief. 13 M.J. at 419 (footnote omitted).

■ Looking at the instant case, we note that of the 210 days between preferral of charges and the date of trial, 180 occurred after the accused made his request for speedy trial.[5] The Government offered explanations for the delays at each point of the process. The initial delay following the commission of the offense appears to be largely attributable to the investigation as to the connection of the accused with Dennis' death. The delays after preferral appear to stem from the fact that the general court-martial jurisdiction was a very busy one. Since we are not prepared to say that the Army's primary mission is to investigate and try court-martial charges, we must accept the fact that there will be occasions when mission requirements may make it impossible to process cases as expeditiously as we might ideally wish. The accused was only restricted for a brief period and was never confined in spite of the serious nature of the manslaughter charge. The delay and inability to secure the attendance of the two witnesses appears to be more the fault of the defense counsel than the fault of the Government, which moved quite expeditiously after notice was given. Further, in any event, the dismissal of the manslaughter charge as part of the pretrial agreement appears to have removed any real necessity for the appearance of the witnesses. The other aspects of prejudice alleged by the accused are common to anyone awaiting trial, and his confession and subsequent pleas of guilty indicate that he harbored little chance of acquittal. We conclude, therefore, that while the processing times are

---

**5.** We do not wish to imply that a 210 or 180-day time period between preferral of charges and the beginning of trial would be acceptable in all cases. Obviously the quantum of delay is one of the factors set forth by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530–32, 92 S.Ct. 2182, 2192–93, 33 L.Ed.2d 101 (1972). Further, these factors should not be considered exclusive in this area; indeed, Sixth Amendment considerations might well be over- come by Fifth Amendment due-process considerations in an aggravated case. Here, the length of delay, while extensive, was balanced by the explanations for the delay and the relative absence of prejudice to the accused. However, in another case, improper reasons and/or the showing of specific prejudice to the accused might well trigger a Fifth-Amendment violation.

certainly not a model to be emulated in any way, they were simply the result of operational requirements which prevented more expeditious handling. The Government's pace of "moving forward somewhat faster than the pace of a turtle but somewhat less fast than the speed of a hare" was nonetheless constant, and, as we find no prejudice to this accused, it was sufficient.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.