# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

## No. 201700011

———————————

### UNITED STATES OF AMERICA
Appellee

v.

### MICHAEL M. FARRELL
Lieutenant Colonel (O-5), U.S. Marine Corps
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Eugene H. Robinson, Jr., USMC.
Convening Authority: Commanding General, III Marine
Expeditionary Force, Okinawa, Japan.
Staff Judge Advocate's Recommendation: Lieutenant Colonel C.B.
Shaw, USMC.
For Appellant: Commander Donald R. Ostrom, JAGC, USN.
For Appellee: Major Kelli A. O'Neil, USMC; Lieutenant George R.
Lewis, JAGC, USN.

———————————

Decided 26 April 2018

———————————

Before MARKS, JONES, and WOODARD, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

JONES, Judge:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his pleas, of attempted receipt of child pornography, attempted sexual assault of a child, attempted sexual abuse of a child, attempted adultery, conduct unbecoming an officer and a gentleman, and fraternization, in violation of Articles 80, 133, and 134, Uniform Code of

Military Justice (UCMJ), 10 U.S.C. §§ 880, 933, and 934 (2012). The military judge sentenced the appellant to 60 months' confinement, a reprimand, and a dismissal. The convening authority (CA) approved the sentence as adjudged but, pursuant to a pretrial agreement (PTA), suspended all confinement in excess of 30 months and, except for the dismissal, ordered the remainder of the sentence executed.

The appellant claims that his trial defense counsel (TDC) were ineffective because they: (1) failed to seek his release from pretrial confinement and move the court for confinement credit under RULE FOR COURTS-MARTIAL (R.C.M.) 305(k), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.); and (2) failed to raise an Article 10, UCMJ, speedy trial motion. The appellant also asserts that he suffered pretrial punishment in violation of Article 13, UCMJ.

Although not raised by the parties, we note that the court-martial order contains an error, and we order corrective action in our decretal paragraph. We conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In January 2015, in Okinawa, Japan, the appellant began using instant messaging applications to exchange sexually charged text messages with someone he thought was a 13-year-old girl. In reality, he was communicating with an undercover law enforcement agent. On 30 June 2015, the appellant drove to base housing to pick up the fictional girl and take her to an off-base hotel room he had rented for a sexual encounter. He was apprehended and interrogated by the Naval Criminal Investigative Service (NCIS). A search of the appellant's phone revealed that he had also been engaging in sexual conversations and exchanging sexually explicit pictures with multiple male enlisted personnel. NCIS later discovered he was also a suspect in another undercover criminal investigation involving an underage girl.

The appellant was arraigned in October 2015, and trial was set for January 2016. But in December 2015, the military judge granted the TDC's continuance motion, moving the trial to April 2016. Then, in January 2016, the appellant filed a motion alleging the CA was an accuser and seeking dismissal of the charges. On 10 March 2016, the military judge granted the appellant's accuser motion—finding that Brigadier General (BGen) King was a "type three" accuser in violation of Article 1(9), UCMJ—and dismissed the charges without prejudice.[1] Seven days after the ruling, the government

---

[1] Appellate Exhibit (AE) XXXIX. The defense motion "focused on BGen King's role in the Operational Planning Team for the Marine Corps SAPR [Sexual Assault

preferred charges alleging the same offenses and misconduct, and one additional charge. The appellant eventually negotiated a PTA and pleaded guilty in September 2016. The appellant remained in pretrial confinement from the day of his apprehension until his guilty plea and sentencing.

## II. DISCUSSION

### A. Ineffective assistance of counsel

The appellant asserts that his TDC were ineffective because they: (1) failed to seek his release from confinement and move the court for confinement credit; and (2) failed to raise an Article 10, UCMJ, speedy trial motion. We disagree.

We review claims of ineffective assistance of counsel *de novo*. *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015). The appellant bears the burden of showing: (1) that his counsel's performance was deficient and (2) that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Both prongs must be satisfied for the appellant to clear this "high bar" and prevail on such a claim. *Id.* at 371.

In a guilty plea context, however, the burden on the appellant is even greater. This is because "[t]he second [*Strickland*] prong is modified to focus on whether the 'ineffective performance affected the outcome of the plea process.'" *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59, (1985)). And "[i]t is not necessary to decide the issue of deficient performance when it is apparent that the alleged deficiency has not caused prejudice." *Id.* (citing *Loving v. United States*, 68 M.J. 1, 2 (C.A.A.F. 2009)). "'[T]o satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for

---

and Prevention Response] Campaign, his testimony to the Senate Armed Services Committee and his unwillingness to resolve the case short of a contested trial." Appellant's Brief of 31 May 2017 at 5-6. The appellant had been a main member of BGen King's staff, and just prior to the incident BGen King had written the appellant a letter of recommendation to work at the White House. After the appellant was apprehended, BGen King revoked his recommendation. AE XXXIV. The military judge found that the personal relationship between BGen King and the appellant, as well as BGen King's significant role in the development of the SAPR Campaign (*see* AE XXXVI), gave rise to *an appearance* of partiality. Based on this appearance, the military judge concluded that BGen King was a "type-three" accuser—someone with a personal (rather than an official) interest in the prosecution of the appellant—in violation of Article 1(9), UCMJ. Lieutenant General Nicholson—the Commanding General of III Marine Expeditionary Force, and superior in command to BGen King—took over as CA. *See* Art 22(b), UCMJ.

counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Id.* (quoting *Hill*, 474 U.S. at 59) (alteration in original). "A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result." *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403, (2011) (internal quotation marks omitted).

1. *Failing to file motion for release from pretrial confinement and R.C.M. 305(k) credit*

When the military judge dismissed the original charges against the appellant on 10 March 2016, the appellant remained confined, and the government did not go through anew the wickets of R.C.M. 305.[2] There was no new review of the appellant's confinement by either the new CA or an IRO. Additionally, the TDC never sought review of the appellant's confinement status with the military judge. As a result of these alleged failures, the appellant now seeks 175 days of R.C.M. 305(k) credit.[3]

We find the appellant affirmatively waived any motions regarding these issues. He successfully negotiated a PTA with the CA which contained the specially negotiated provision below that waived all waivable motions except a motion filed under Article 13, UCMJ.

---

[2] R.C.M. 305 establishes both procedural requirements—and remedies for noncompliance—when placing an accused in pretrial confinement. Procedurally, the rule requires three things. First, within 72 hours of ordering a prisoner into pretrial confinement, the commander must determine whether confinement should continue. R.C.M. 305(h)(2)(A). Second, within 48 hours of entry into confinement, a neutral and detached officer must review the adequacy of the probable cause to continue that confinement. R.C.M. 305(i)(1). Third, within seven days of the imposition of confinement, a neutral and detached officer must review both the probable cause determination and the necessity for continued confinement. R.C.M. 305(i)(2). This neutral and detached officer is referred to as the Initial Review Officer (IRO), and the hearing—typically held at the confinement facility—is called the IRO hearing.

The remedy for failure to comply with these procedural rules "shall be an administrative credit against the sentence adjudged for any confinement served as the result of such noncompliance." R.C.M. 305(k). Absent a showing of an abuse of discretion or unusually harsh circumstances, such credit shall be computed at the rate of 1 day credit for each day of confinement served as a result of such noncompliance. *Id.* This credit is in addition to the day-for-day confinement credit an accused receives. *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984).

[3] "The 175-day calculation is from the order for dismissal on 10 March 2016 until the Article 39(a)[, UCMJ,] session for plea and sentencing on 1 September 2016." Appellant's Brief at 19.

8(i). I agree to waive all waivable motions. This provision in no way limits my right to raise any motion under Article 13, [UCMJ], or any other motion that cannot be waived. I have not been compelled to waive my right to due process, the right to challenge the jurisdiction of the court-martial, the right to a speedy trial, the right to raise the issue of unlawful command influence, or any other motion that cannot be waived.[4]

The language here is unambiguous; it is clear exactly what the appellant was waiving and what he was not. The appellant confirmed to the military judge that he understood this section of the PTA and did not have any questions.

MJ: Take a look at Paragraph 8. It lists your specially negotiated provisions. Have you read each and every provision and discussed them with your counsel?

ACC: Yes, Your Honor.

MJ: Are there any specially negotiated provisions that you would like for me to explain or discuss with you in more detail?

ACC: No, Your Honor.[5]

The appellant cannot—and indeed does not—claim that motions to release him from confinement or receive R.C.M. 305(k) credit are not waivable. They are waivable. *See United States v. Gladue*, 67 M.J. 311, 314 (C.A.A.F. 2009) (a "waive all waivable motions" provision is a valid term in a PTA which extinguishes the right to raise the motion on appeal); *United States v. Murphy*, No. 201000262, 2010 CCA LEXIS 774, at *3-4 unpublished op. (N-M. Ct. Crim. App. 23 Nov 2010) (per curiam). Here the appellant waived all waivable motions with the exception of a motion under Article 13, UCMJ, which he had raised and preserved at trial. The appellant offers no evidence whatsoever to contradict his express waiver of these motions.

Lastly, if the appellant forfeited, rather than waived these motions, he fails to demonstrate plain error. *See United States v. Davis*, 76 M.J. 224, 227 n.1 (C.A.A.F. 2017) ("Forfeiture is the passive abandonment of a right by neglecting to preserve an objection, whereas waiver is the affirmative, intentional relinquishment or abandonment of a known right. . . . Forfeiture results in plain error review, but waiver leaves no error for us to correct on appeal." (citations and internal quotation marks omitted.))

---

[4] AE XIII at 4-5.

[5] Record at 263.

Assuming, *arguendo*, that the waiver is not dispositive and the appellant may have been entitled to relief, this "does not by itself satisfy the prejudice analysis in the guilty plea context. [The a]ppellant also must satisfy a separate, objective inquiry—he must show that if he had been advised properly, then it would have been rational for him not to plead guilty." *Bradley*, 71 M.J. at 17. (citing *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485, (2010)).

The government's case against the appellant was formidable. He was apprehended outside what he believed to be the home of an underage girl. He had come to collect her for a sexual encounter in a nearby hotel room he had just rented and staged. The government also possessed hundreds of incriminating text messages and emails evidencing his guilt of a number of offenses. The TDC and the appellant, in apparent recognition of the strength of the government's case and the appellant's punitive exposure, single-mindedly pursued a PTA. When the original CA refused to agree to a PTA, they successfully filed a motion to replace him. The appellant was facing over 80 years' confinement but negotiated a PTA limiting his confinement exposure to 30 months. The appellant has made no showing that he was improperly advised as to the propriety of his continued pretrial confinement under RCM 305 or any credit therefor, or that he would have abandoned his hard-fought PTA to preserve any related issue. Every day he spent in pretrial confinement, receiving full pay and allowances, was credited against his eventual sentence. In addition, the appellant has not carried his burden to show that there is a substantial likelihood of a different result at trial. *See id.* at 16.

The appellant has failed to show that his TDC were deficient in their performance and, even if they were deficient, the deficiency did not result in any prejudice. Therefore, his TDC were not ineffective for not raising these motions.

### 2. Failing to file Article 10, UCMJ, speedy trial motion

The appellant also contends that his TDC were ineffective because they did not file an Article 10, UCMJ, speedy trial motion. He contends that as a result, he "spent 429 days in pretrial confinement while the government did not diligently move his case to trial."[6]

Unlike a motion for release from pretrial confinement or R.C.M. 305(K) credit, the right to assert a speedy trial violation cannot be waived as a provision of a PTA. *See* R.C.M. 705(c)(1)(B). A comprehensive timeline showing all government activities from the moment the appellant was first

---

[6] Appellant's Brief at 20.

placed in pretrial confinement (PTC) to his trial is unavailable because a speedy trial motion was never litigated below. We do not know all of the actions the government counsel took while working on this case. However, to analyze this assignment of error, we need not order a *DuBay* hearing for further fact-finding. *See United States v. DuBay,* 37 C.M.R. 411 (C.M.A. 1967). Rather, we find that we are able to assemble an adequate timeline from the record to inform our decision. The record reflects no dispute about the following dates.[7]

| Date | Event | PTC Day |
|------|-------|---------|
| 30 Jun 2015 | The appellant was apprehended and placed in PTC by the initial CA, Brigadier General (BGen) King, Commanding General, 3d Marine Logistics Group.[8] The appellant granted consent to search his home and hotel room.[9] | 1 |
| 1 Jul 2015 | Commanding General, Marine Corps Installations Pacific granted a "Command Authorization for Search and Seizure" for the appellant's electronics.[10] | 2 |
| 2 Jul 2015 | The appellant's electronics sent to Defense Computer Forensic Laboratory (DCFL). Separate evidence sent to NCIS Cyber offices.[11] | 3 |
| 31 Jul 2015 | Original charges preferred.[12] | 32 |
| 7 Aug 2015 | Forensic examination and extraction of iPhone by investigator revealed new chats and pictures involving several live persons residing in Okinawa, including several junior enlisted service members.[13] Investigators started trying to identify, locate, and interview these persons. | 39 |

---

[7] *See also* Appellant's Brief at 10-11; Appellee's Brief of 2 Oct 2017 at 5-8.

[8] Record at 191, 352; AE XXVI at 89.

[9] AE XXVII at 4.

[10] AE VI at 3.

[11] *Id.*

[12] AE XXXIX at 2.

[13] AE III at 12, 19.

| | | |
|---|---|---|
| 13 Aug 2015 | Preliminary Hearing Officer (PHO) appointed.[14] | 45 |
| 21 Aug 2015 | Interview of potential victim.[15] | 53 |
| 4 Sep 2015 | The appellant unconditionally waived his right to original Preliminary Hearing (PH) under Article 32, UCMJ.[16] | 67 |
| 15 Sep 2015 | Government received DCFL forensic analysis report. NCIS case agent began review of extensive evidence, which lasted until 28 October 2015.[17]<br><br>Defense signed Stipulation of Fact.[18] | 78 |
| 17 Sep 2015 | The appellant submitted first proposed PTA, offering to plead guilty within five days.<br><br>BGen King rejected the PTA with no counteroffer.[19] | 80 |
| 23 Sep 2015 | Original charges referred.[20] | 86 |
| 9 Oct 2015 | The appellant was arraigned.[21] The military judge signed Trial Management Order setting agreed-upon trial date of 25 January 2016.[22] | 102 |
| 21 Oct 2015 | Government gave defense MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 404(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES, (2012 ed.) notice of intent to introduce certain prior acts at trial.[23] | 114 |
| 23 Oct 2015 | Government gave second MIL. R. EVID. 404(b) notice.[24] | 116 |

---

[14] AE XXXIX at 2.

[15] Appellee's Brief at 6.

[16] AE XXVI at 90.

[17] AE VI.

[18] AE XXVI at 47-77.

[19] *Id.* at 78-88.

[20] Record at 2; AE XXXIX at 3.

[21] AE XX.

[22] AE XXI.

[23] AE XXVII at 6.

[24] *Id.*

| | | |
|---|---|---|
| 28 Oct 2015 | iPad sent to NCIS Cyber Office in Hawaii for analysis after local analysis failed.[25] NCIS agents sent approximately images found on the appellant's devices to the National Center for Missing and Exploited Children (NCMEC) for analysis.[26] | 121 |
| 4 Nov 2015 | Interview of additional potential victim.[27] | 128 |
| 6 Nov 2015 | Case Agent finished review of digital media received from DCFL. (AE VI.) Additional images flagged for possible child pornography and sent to NCMEC.[28] | 130 |
| 4 Dec 2015 | TDC requested continuance of trial date from 25 January 2016 to 11 April 2016.[29] | 158 |
| 7 Dec 2015 | Military judge granted TDC's continuance request.[30] | 161 |
| 31 Dec 2015 | NCMEC reported no hits for known victims of child pornography among images sent 28 October 2015.[31] | 185 |
| 11 Jan 2016 | TDC filed an accuser motion seeking disqualification of BGen King as the CA and dismissal of the charges without prejudice.[32] | 196 |
| 22 Jan 2016 | Government filed response to accuser motion.[33] | 207 |
| 26 Jan 2016 | Accuser motion litigated.[34] | 211 |
| 4 Feb 2016 | NCMEC reported no hits for known victims of child pornography among additional images sent 6 November 2015.[35] | 220 |
| 18 Feb 2016 | NCIS Cyber Office in Hawaii reported that they were | 234 |

---

[25] AE VI.

[26] AE VI at 3.

[27] Appellee's Brief at 6.

[28] AE VI.

[29] AE XXIII.

[30] *Id.*

[31] AE VI.

[32] AE XXVI.

[33] AE XXVII.

[34] Appellee's Brief at 6.

[35] AE VI.

| | | |
|---|---|---|
| | unable to extract information from the appellant's iPad due to its operating system.[36] | |
| 10 Mar 2016 | Military judge granted the appellant's accuser motion—finding that BGen King was a "type three" accuser in violation of Article 1(9), UCMJ—and dismissed the charges without prejudice. | 255 |
| 17 Mar 2016 | Government re-preferred charges with new CA.[37] | 262 |
| 24 Mar 2016 | Government preferred additional charge.[38] | 269 |
| 5 Apr 2016 | Start date for government delay for additional investigation pursuant to CA's retroactive grant of excludable delay.[39] | 281 |
| 22 Apr 2016 | PHO appointed.[40] | 298 |
| 27 Apr 2016 | TDC requested delay of the PH from 3 to 18 May 2016.[41] | 303 |
| 24 May 2016 | Government requested backdated excludable delay from 5 April 2016 to 27 May 2016 due to investigation.[42] | 330 |
| 27 May 2016 | End date for excludable government delay for investigation.[43] | 333 |
| 28 May 2016 | Excludable delay started on TDC's request for delay.[44] | 334 |
| 3 Jun 2016 | Excludable delay ended on TDC's request for delay.[45] | 340 |

[36] *Id.*

[37] AE III at 1. The charges the new CA referred were identical to the original charges that were dismissed.

[38] *Id.* The additional charge that was not referred was an alleged violation of Article 134, UCMJ, 10 U.S.C. § 934 (2012), Child Pornography. The PHO had found no probable cause to refer the charge.

[39] Appellee's Brief at 7.

[40] AE III at 12.

[41] AE III at 12; Appellee's Brief at 7.

[42] Appellee's Brief at 7.

[43] *Id.*

[44] *Id.*

[45] *Id.*

| | | |
|---|---|---|
| 6 Jun 2016 | Defense submitted request for speedy trial.[46] | 343 |
| 9 Jun 2016 | New CA granted the excludable delays retroactively.[47] | 346 |
| 14 Jun 2016 | PH conducted.[48] | 351 |
| 22 Jun 2016 | PHO completed his report.[49] | 359 |
| 1 Jul 2016 | New CA referred all charges except the additional charge.[50] | 368 |
| 6 Jul 2016 | Charges served on the appellant.[51] | 373 |
| 12 Jul 2016 | The appellant was arraigned and pled not guilty.[52] Parties agreed to Trial Management Order setting trial date of 12 September 2016.[53] | 379 |
| 28 Jul 2016 | Article 39(a) session held. Several motions litigated, including suppression of evidence and granting of a defense expert consultant.[54] | 395 |
| 3 Aug 2016 | PTA signed by all parties with agreement to go to trial by 12 September 2016.[55] | 401 |
| 1 Sep 2016 | The appellant signed Stipulation of Fact and pled guilty.[56] | 429 |
| 7-8 Sep 2016 | Sentencing hearing conducted.[57] Military judge announced ruling on Article 13, UCMJ, pretrial punishment motion and sentence.[58] | 436-7 |

---

[46] Record at 11.

[47] Appellee's Brief at 7.

[48] Record at 2.

[49] *Id.*; AE III at 10.

[50] AE III at 9.

[51] Charge Sheet

[52] Record at 10.

[53] *Id.* at 8; AE I.

[54] Record at 12-42; AE XXXVII and XXXVIII.

[55] AE XIII.

[56] Record at 45-48; Prosecution Exhibit 1.

[57] *Id.* at 269-363.

Article 10, UCMJ, commands that when a service member is placed in pretrial confinement, "immediate steps shall be taken . . . to try him or to dismiss the charges and release him." In reviewing Article 10, UCMJ, claims, courts do not require "constant motion, but reasonable diligence in bringing the charges to trial." *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2005) (citations and internal quotation marks omitted). This "duty imposed on the [g]overnment . . . does not terminate simply because the accused is arraigned." *United States v. Cooper*, 58 M.J. 54, 60 (C.A.A.F. 2003). Rather, it extends to "at least the taking of evidence." *Id.* Finally, we look at four factors in examining the circumstances surrounding an alleged Article 10, UCMJ, violation: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *Mizgala*, 61 M.J. at 129 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Given this legal framework, we now analyze the *Barker* factors. In doing so, we recognize that "none of the four factors has any talismanic power[;]" rather, "we must . . . weigh all the factors collectively before deciding whether a defendant's right to a speedy trial has been violated." *United States v. Wilson*, 72 M.J. 347, 354-55 (C.A.A.F. 2013) (citations and internal quotation marks omitted).

a. Length of the delay

The length of delay constitutes a triggering mechanism under Article 10, UCMJ. The government contends that while 429 days "may appear at first glance facially unreasonable, facial unreasonableness requires consideration of the case's circumstances."[59] While we agree with this general proposition, we believe the length of the delay in this case merits a full *Barker* analysis. *See United States v. Kossman*, 38 M.J. 258, 261 (C.M.A. 1993) (holding that an Article 10, UCMJ, speedy-trial motion could "succeed where a period under 90—or 120—days is involved."); *see also United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010) (145-day delay triggered the full *Barker* analysis); *United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007) (117 days); *Mizgala*, 61 M.J. at 128-29 (117 days). This factor weighs in the appellant's favor.

b. Reasons for the delay

The delays in this trial are largely attributable to the ongoing forensic analysis of evidence as it was discovered, the TDC waiting three-and-one-half

---

[58] *Id.* at 364-78.

[59] Government Brief at 20 (citing *United States v. Schuber*, 70 M.J. 181, 188 (C.A.A.F. 2011).

months to file their dismissal motion, and the time needed to renew the pretrial process.

Our review of the record shows that the government acted with reasonable diligence by thoroughly investigating the appellant's extensive misconduct while moving the case to trial.[60] We disagree with the appellant's assertion that when he was apprehended the government's evidence was complete and their case substantially perfected. The evidence supporting a number of the offenses of which the appellant was convicted was only discovered during the government's continuing investigative actions after the appellant was apprehended. The government always "has the right (if not the obligation) to thoroughly investigate a case before proceeding to trial." *Cossio*, 64 M.J. at 258. Two days after the appellant was apprehended, the government sent his seized electronics to DCFL and to the NCIS Cyber offices for analysis. In September 2015, the DCFL report was received, and the NCIS case agent began reviewing the evidence. This revealed that the appellant's sexual chatting was prolific and resulted in the discovery of many new chats, chat partners, and pictures which had to be investigated and analyzed. Several of these people had to be identified, found, and interviewed. The investigation also disclosed that the appellant was a suspect in a separate undercover investigation similar to the one that resulted in his court-martial.

By November 2015, NCIS's comprehensive review had flagged 28 possible images requiring further investigation and analysis, and ultimately two different groups of images were sent for additional analysis and review. Additionally, when the government was unable to access the appellant's iPad locally, they sent it to the NCIS Cyber Office in Hawaii for examination. By February 2016, they learned that they were unable to extract any data from the iPad. During this entire time, the government continued to comb through the evidence and identify and interview witnesses to several fraternization charges.

Another reason for the delay was that the appellant waited more than three months to file his successful dismissal motion, which significantly delayed the processing of the case. During the initial trial proceedings, on 9 October 2015—some three months after he was placed in confinement—the appellant agreed to an original trial date of 25 January 2016, more than three months away. Then, two weeks before the trial was scheduled to begin, the TDC filed their motion to dismiss. Notably, this is three and one-half months after their initial PTA was rejected by BGen King in September 2015 and more than six months after the appellant was confined. There is nothing

---

[60] *See id.* at 5-8 for a summary of the events.

in the record to indicate that the TDC needed this time to garner new evidence or information for their motion. The motion hearing was held in February, and the military judge granted the motion on 10 March 2016.

Finally, it took the government time to go through the pretrial process anew. In response to the ruling, the government initially moved quickly to re-prefer the charges on 17 March 2016 and prefer an additional charge a week later. On 22 April 2016, the new CA signed the Article 32, UCMJ, preliminary hearing convening order, ordering the hearing to take place not later than 3 May 2016. The record is silent on why the government took six weeks from preferral of charges on 10 March 2016 until the PHO was appointed. Even considering it may have taken some time for a new CA to identify a PHO who both outranked the appellant and was not conflicted, six weeks seems to be an excessive amount of time to accomplish this task. This particular delay cuts against the government, and we will consider this when we determine if the delay was unreasonable.

The hearing was held on 14 June 2016, after both sides had requested delay—the government to seek further evidence, and the defense to try to broker a PTA. On 1 July 2016, after receiving the 22 June 2016 PHO's report and the 30 June 2016 SJA's recommendation, the new CA referred the charges. Notably, when the appellant was arraigned on 12 July 2016, he agreed to a trial date more than two months out. He also never filed an Article 10, UCMJ, speedy trial motion despite having demanded a speedy trial on 6 June 2016. When we consider that the timeframe in the appellant's case comprised two discrete trial processes—because of the appellant's successful dismissal motion—the reasons for the delay are more easily explained. To be clear, the appellant's motion to dismiss does not waive or even weaken his right to a speedy trial. But when the accuser motion was successful, the entire trial process had to be restarted, which took significant time.

To be sure, the timeline in this case reveals unexplained government delays between case milestones—particularly between 17 March 2016 and 22 April 2016 and between 18 May 2016 and 14 June 2016. We do not know with certainty what actions different government actors took during those timeframes because a speedy trial motion was never litigated at trial. Regardless, we do not find that the prosecution against the appellant significantly languished. The government is not required to show "constant motion, but reasonable diligence in bringing the charges to trial." *Mizgala*, 61 M.J. at 127. And there is no Article 10, UCMJ, violation where the record "does not establish [g]overnment indifference or substantial inactivity *over the full course of the pretrial proceeding*[.]" *Thompson*, 68 M.J. at 314 (emphasis added).

Given the extensive forensic investigation conducted, the appellant's successful dismissal motion which started the trial process anew, and the appellant's continuance requests and acquiescence to trial milestones, we find that the delay in this case was not unreasonable. Although we find that the government's diligence in getting the appellant to trial was not exemplary, we do conclude that it was at least reasonable given the particular facts of this case. Therefore, the reasons for the delay weigh slightly in the government's favor.

c. Demand for speedy trial

In *Barker*, the Supreme Court noted that "[t]he more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. However, we have also long held that "the right to a speedy trial is a shield, not a sword." *United States v. Miller*, 66 M.J. 571, 575 (N-M. Ct. Crim. App. 2008) (citation and internal quotation marks omitted). Here, the appellant appears to have used his speedy trial request as a sword. It is significant that: (1) the appellant did not demand speedy trial until 6 June 2016, more than 11 months after he was placed in pretrial confinement; (2) he never filed an Article 10, UCMJ speedy trial motion; and (3) when arraigned a month after his speedy trial request, the appellant agreed to a trial date that was still two months away.

The appellant also sought continuances while he repeatedly attempted to negotiate a PTA. Most noteworthy, on 4 December 2015—almost two months after the appellant was originally arraigned—the TDC requested a 77-day continuance of the trial from 25 January 2016 to 11 April 2016. Additionally, the TDC requested a 15-day delay to the start of the Article 32, UCMJ, preliminary hearing which was scheduled for 3 May 2016. All of these actions are consistent with efforts to secure a PTA and avoid a contested trial. This is understandable given the overwhelming evidence against the appellant, however, he cannot petition for and agree to delay and then demand dismissal for that same delay.[61]

---

[61] *See United States v. King*, 30 M.J. 59, 66 (C.M.A. 1990) (holding that an accused "cannot be responsible for or agreeable to delay and then turn around and demand dismissal for that same delay"); *United States v. Wiley*, No. 201600120, 2017 CCA LEXIS 538, at *14-15 unpublished op. (N-M. Ct. Crim. App. 10 Aug 2017) (finding that the delay between arraignment and trial which was agreed upon by the trial defense counsel was presumptively reasonable); *see also Cooper*, 58 M.J. at 60 (explaining that "by the time an accused is arraigned, a change in the speedy-trial landscape has taken place. This is because after arraignment, the power of the military judge to process the case increases, and the power of the [Government] to

These particular facts are more demonstrative of an appellant that is trying to negotiate a favorable PTA with the CA rather than an appellant that is demanding his day in court. Yet, regardless of the appellant's intentions, he asserted his right to a speedy trial, therefore this factor ultimately weighs slightly in his favor.

d. Prejudice to the appellant

"Prejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Mizgala*, 61 M.J. at 129 (citation and internal quotation marks omitted). We examine the question of prejudice in light of three important interests the Supreme Court identified in *Barker*: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern; and (3) to limit the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532.

First, the appellant filed an Article 13, UCMJ, motion at trial, claiming that he suffered pretrial incarceration so oppressive it constituted punishment. The military judge found that the conditions of the appellant's pretrial confinement did not amount to pretrial punishment. In Section C, *infra*, we find the military judge did not abuse his discretion and affirm his ruling. Accordingly, we find that the appellant did not experience oppressive pretrial incarceration.

Second, the appellant did suffer measureable anxiety and concern. A mental health nurse practitioner who treated the appellant "believe[d] that his depression and anxiety symptoms were directly related to incarcerations, [sic] the legal stressors that he was going through."[62] But it is certainly reasonable that anyone in the appellant's position, facing such serious charges, would be anxious and depressed. In and of itself, pretrial confinement "necessarily involves some anxiety and stress[.]" *Mizgala*, 61 M.J. at 129. The prejudice analysis under *Barker* requires that the appellant suffer "some degree of particularized anxiety and concern greater than normal anxiety and concern associated with pretrial confinement." *Wilson*, 72 M.J. at 354 (citation and internal quotations omitted). Although a close call, the nurse practitioner's diagnosis sways us to find that the appellant showed some degree of particularized anxiety and concern greater than normal. This factor weighs in favor of the appellant.

Third, the appellant has failed to present any evidence showing that the delay impaired his defense. Of the three parts of the prejudice analysis, this

---

affect the case decreases.") (alteration in original) (citation and internal quotation marks omitted).

[62] Record at 60.

last part—hindering the defense—is the most heavily weighted "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *United States v. Johnson*, 17 M.J. 255, 259 (C.M.A. 1984) (quoting *Barker*, 407 U.S. at 532) (internal quotations omitted). Here, the appellant focuses his entire argument on allegations of pretrial punishment,[63] not on how any delay resulted in an impairment of his ability to defend himself. As in *Mizgala*, "there is no indication that [the appellant's] preparation for trial, defense evidence, trial strategy, or ability to present witnesses, on [either] the merits [or] sentencing, were compromised by the processing time in this case." *Mizgala*, 61 M.J. at 129.

In sum, although the appellant suffered some anxiety and concern beyond the norm, he was not subject to oppressive pretrial incarceration and his defense was not impaired. We conclude that the prejudice factor weighs in favor of the government.

e. Weighing the four *Barker* factors

We found two factors in favor of the appellant: the length of time getting him to trial and his request for a speedy trial. In other words, there was a significant length of time sufficient to trigger further speedy trial analysis, and the appellant made a pro forma request for speedy trial almost a year after he was placed in PTC. But these factors are substantially outweighed by those favoring the government: the reasons for the delay and the lack of prejudice to the appellant. We find the reasons for the delay largely explainable and any gaps in governmental action not overly excessive, especially in light of the government having to restart the entire trial process.

Most importantly, the appellant can point to no meaningful prejudice he suffered as a result of any delay. He ultimately secured a favorable PTA—reducing his confinement exposure from over 80 years to 30 months—which appeared to be his overriding goal. He experienced anxiety and depression, but he did not suffer oppressive pretrial incarceration. Lastly—and most significantly—his ability to mount a defense was not impaired. After carefully weighing the four *Barker* factors, we conclude that the appellant was not denied his right to a speedy trial under Article 10, UCMJ.

f. No ineffective assistance of counsel

The appellant has failed to show that his TDC were deficient by failing to raise an Article 10, UCMJ, motion. And, even if they were deficient in failing to raise the motion, that deficiency resulted in no prejudice to him.

---

[63] Appellant's Brief at 18.

First, the TDC were not deficient in their performance. They persistently and zealously negotiated for a PTA for their client. Their decision to request speedy trial but not file an Article 10, UCMJ, motion suggests they sought leverage for a PTA, not a speedy trial. Recognizing the evidence against the appellant—including the appellant's confession and admissions to NCIS—was particularly strong and likely to result in significant confinement, we find nothing unreasonable about the TDC's tactical decision to permit confinement credit to accrue—while the appellant enjoyed full pay and allowances—rather than file and argue a weak speedy trial motion. *See United States v. Dubouchet*, 63 M.J. 586, 589 (N-M. Ct. Crim. App. 2006) (rejecting "the appellant's assertion that his counsel's performance was ineffective" after noting that the appellant failed to "address any of the tactical reasons why the defense counsel would not raise a speedy trial issue"); *United States v. Patterson*, No. 201600189, 2017 CCA LEXIS 437, at *17, unpublished op. (N-M. Ct. Crim. App. 30 Jun 2017) (noting the appellant "failed to demonstrate how prioritizing confinement credit over a weak speedy trial claim and allowing additional days of potential confinement credit to accrue constitutes deficient performance." (citation omitted)). The *Barker* court noted, "[d]elay is not an uncommon defense tactic." 407 U.S. at 521. Indeed, delay often inures to the accused's advantage.

Second, the appellant suffered no prejudice. In order to satisfy the second prong of *Strickland* and demonstrate prejudice based on a failure to raise the speedy trial motion, "the appellant must show that there is a reasonable probability that such [a] motion would have been meritorious." *Dubouchet*, 63 M.J. at 589 (citations and internal quotation marks omitted). For the reasons set forth above, we conclude that there is no reasonable "probability sufficient to undermine confidence in the outcome" that the appellant would have prevailed on this motion. *Strickland*, 466 U.S. at 694. In sum, there was no denial "of a fair trial," resulting in "a trial whose result is unreliable." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001) (citation and internal quotation marks omitted).

## B. Article 13, UCMJ, unlawful pretrial punishment

The appellant contends that the government violated the Article 13, UCMJ, prohibition against unlawful pretrial punishment when it denied him adequate medical and mental health care, imposed overly harsh conditions on him, and violated his confidentiality with his attorneys.

"The burden is on [the] appellant to establish entitlement to additional sentence credit because of a violation of Article 13[, UCMJ]." *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002) (citing R.C.M. 905(c)(2)). Whether an appellant is entitled to relief for a violation of Article 13, UCMJ, is a mixed question of law and fact. *Id.* (citing *United States v. Smith*, 53 M.J. 168, 170

(C.A.A.F. 2000); *United States v. McCarthy*, 47 M.J. 162, 165 (C.A.A.F. 1997)) (additional citation omitted). "We will not overturn a military judge's findings of fact, including a finding of no intent to punish, unless they are clearly erroneous. . . . We will review *de novo* the ultimate question whether [this] appellant is entitled to credit for a violation of Article 13[, UCMJ]." *Id.* (citing *Smith*, 53 M.J. at 170).

Article 13, UCMJ, states that "[n]o person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence[.]" In other words, Article 13, UCMJ, prohibits two things: (1) pretrial punishment and (2) PTC under unduly rigorous circumstances.

*1. No pretrial punishment*

Article 13, UCMJ, prohibits pretrial punishment.

> [T]he question of whether particular conditions amount to punishment before trial is a matter of intent, which is determined by examining the purposes served by the restriction or condition, and whether such purposes are "reasonably related to a legitimate governmental objective."

> [I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective.

*Howell v. United States*, 75 M.J. 386, 393 (C.A.A.F. 2016). We will examine the military judge's findings.

The appellant did not provide any evidence that BGen King intended to punish him. The TDC merely posited that because BGen King had been labeled an accuser by the military judge—and thus removed as the CA—there was evidence of intent to punish the appellant. But the military judge was not persuaded, concluding that "the prior disqualification of the former [CA] does not evince an intent on the part of the government to punish the [appellant] . . . . The disqualification resulted from the appearance of bias . . . [which] does not equate to an intent to punish the [appellant]."[64] Additionally, the military judge found that the appellant had not established that any other government actor—especially any of the brig personnel—intended to punish the appellant. Finally, the military judge concluded that "[a]lthough the [appellant] testified about the unpleasantness of his

---

[64] Record at 372.

conditions while in confinement, there was no evidence presented that the conduct of government officials intended to punish him."[65]

There being no intent to punish, we next "look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." *Howell*, 75 M.J. at 393. Here, the appellant failed to identify a "particular restriction or condition" of his pretrial confinement that did not serve a legitimate government purpose. The military judge also made specific findings of fact that the medical care, physical training, and searches of the appellant's cell were all legitimate government actions.[66]

The military judge's findings of fact are supported by the record and are not clearly erroneous. Nor are his conclusions of law incorrect. We turn next to focus with more particularity on the circumstances of the appellant's pretrial confinement.

### 2. No unduly rigorous circumstances of confinement

Article 13, UCMJ, prohibits the imposition of unduly rigorous circumstances during PTC. "Conditions that are sufficiently egregious may give rise to a permissive inference that an accused is being punished, or the conditions may be so excessive as to constitute punishment." *United States v. Harris*, 66 M.J. 166, 168 (C.A.A.F. 2008) (citations and internal quotation marks omitted). We will examine the military judge's findings with regard to the three types of alleged punishment the appellant has challenged again on appeal: (a) denial of adequate medical and mental health care, (b) overly harsh conditions at the brig, and (c) violation of his confidentiality with his attorneys.

### a. Denial of adequate medical and mental health care

The appellant's principal complaint regarding his medical care was that he had been denied his Continuous Positive Airway Pressure (CPAP) machine for the first year of his pretrial confinement. As a result, he claimed he woke up every few hours at night, causing him to be exhausted during his daily routine. The military judge found that the appellant had informed brig personnel, during his July 2015 in-processing, that he had been prescribed the CPAP machine. However, in spite of regular appointments with a brig counselor over many months, the appellant only mentioned wanting his CPAP machine in January 2016. When he finally did discuss it, he told his counselor that the medical staff was aware of the issue, and he denied any

---

[65] *Id.* at 374.

[66] *Id.* at 368, 370.

further medical concerns. But the brig medical staff did not do anything to further assist the appellant in securing the CPAP machine.

In February 2016, during another weekly interview, the appellant complained about delays in receiving medications, and that he still did not have his CPAP machine. He again denied any medical distress. His counselor told him to file a chit with medical so they would assist him in getting the machine. No action was taken to assist the appellant in receiving the machine until the issue was finally raised by the appellant to the commanding officer (CO) of the brig around June of 2016. The CO immediately spoke with the independent duty corpsman (IDC) to try to resolve the problem. The IDC asked the appellant's family about the machine and was told it was broken. The family was then asked to bring the machine to the brig so it could be repaired. After some delay, the family finally brought it in, it was repaired, and special accommodations were made to ensure the appellant had access to electricity and batteries for the machine.[67]

The military judge acknowledged that the strongest claim the appellant had regarding unnecessarily harsh conditions at the brig was not having his CPAP machine for about a year. But he found even this did not amount to unnecessarily harsh conditions.

> While this negligent failure on the part of brig personnel to ensure that the [appellant's] CPAP machine was obtained, repaired, and delivered to him apparently was not resolved for a one-year period, it did not rise to the level of being so egregious or so excessive as to constitute an unnecessarily harsh condition as the defense makes of it. Indeed, the only documentation provided to the Court of it actually being reported are two pages from the beginning of 2016 reflecting the [appellant's] comments to his brig counselor, who informed him to submit a chit to medical. Further [the psychiatrist] apparently had within her power the ability to prescribe whatever the [appellant] needed to treat his conditions. She prescribed other medications and treatments for the [appellant] and ensured that he received them. Logically, if the CPAP machine was something that he needed and she was aware, which apparently she was, then she could just as well [have] prescribe[d] a new one for him since there seemed to be

---

[67] For example, the appellant was allowed to have an extension cord running into his cell to power the machine, which is a safety and security hazard. Although he allowed it, the brig CO testified that he had never seen such an accommodation made for a detainee or prisoner before.

difficulty getting it from his home to the brig despite weekly visits by his spouse and occasional visits from his command representative. . . . [H]ad the [appellant] informed the CO earlier in his stay about the machine, perhaps it could have been made available much earlier based upon how quickly it was provided once the CO personally learned about the matter.[68]

The appellant also claims that he suffered sub-standard mental health care when a mental health nurse practitioner and a licensed clinical social worker stopped going to the brig on a regular basis to treat detainees and prisoners. After the social worker stopped going to the brig, she was never replaced. When the mental health nurse practitioner stopped going, she was replaced by a psychiatrist who treated the appellant, although with less frequent visits to the brig than the nurse had conducted. But none of these mental health visits were required under any rule or regulation. The nurse practitioner testified that although the care she and the social worker had originally provided was ideal, it was by no means required under any regulations, and the local naval hospital was always available for routine or emergent mental health issues. The military judge found that there was no regulation, order, or memorandum of understanding that required personal visits to the brig by mental health personnel or social workers.

The hospital's decision to discontinue care above and beyond what was required, but still maintain a level of care well within standards, is not so egregious or excessive as to constitute punishment. The appellant was properly diagnosed by the nurse practitioner as suffering from adjustment disorder with anxiety and depressed mood, in part due to his legal issues, and she prescribed psychotropic medication to assist him. She even tried acupuncture. Moreover, the nurse practitioner testified that the care her replacement (the psychiatrist) provided was also an appropriate level of care.

In sum, the military judge found that the appellant was provided adequate medical and mental health care. We find no clear error in the military judge's findings, and we agree with his conclusions.

b. Overly harsh conditions at the brig

The appellant alleges he suffered a broad litany of overly harsh conditions: having to wear a waist belt and handcuffs when he left the brig to see his TDC; suffering bruising on one of his wrists from a handcuff on one occasion; being compelled to engage in physical training; performing physical training without adequate ventilation and a working drinking fountain; not

---

[68] Record at 373-74.

receiving timely medical appointments; missing administrations of prescribed medication when corpsmen did not show; and having only 20 minutes to eat his meals.

The military judge found the following: the requirement to wear the handcuffs and waist belt complied with appropriate policies, and the bruising was properly identified and dealt with; physical training was mandated and low intensity, and the drinking fountain and ventilation issues were corrected when brought to the attention of the CO; the appellant received adequate medical care; and the time for meals was also set by policy and consistent with that of trainees in boot camp.

"Prisoners can be very vocal about their conditions without those complaints actually reflecting any unlawful pretrial punishment." *United States v. King*, 61 M.J. 225, 228 (C.A.A.F. 2005). In *United States v. Crawford*, 62 M.J. 411 (C.A.A.F. 2006), the CAAF accorded wide-ranging deference to prison officials who adopt and execute "'policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* at 416 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547 (1979)). In light of confinement officials' responsibility to ensure a detainee's presence for trial and the security of the facility, the burden was on Crawford to demonstrate that the conditions of his confinement were "unreasonable or arbitrary[.]" *Id.* at 414; *see also McCarthy*, 47 M.J. at 167 (holding that "[i]f the conditions of pretrial restraint are 'reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment.'") (quoting *United States v. James*, 28 M.J. 214, 216 (C.M.A. 1989)) (additional citations omitted).

The military judge concluded that the appellant did not suffer from overly harsh conditions while in pretrial confinement, and we agree.

c. Violation of confidentiality with attorney

The appellant asserts that confidentiality with his attorney was breached because guards could overhear his conversations with his counsel. The military judge found this not to be the case. In fact, when the appellant complained that he could not adequately hear in the noncontact room—because he suffers from hearing loss in both ears—he was allowed to meet with his counsel in a room without a partition, while a guard stood outside the room watching through a window. Then, when the appellant complained about this arrangement, the CO ordered the appellant's visits back into the noncontact booth but enlarged the window cutout to increase auditory capability. The military judge found no evidence that guards were listening in or could overhear conversations between the appellant and his counsel in either the noncontact booth or the room with no partition.

The appellant also contends that during a search of his cell a brig guard read privileged correspondence between him and his counsel. He believes this to be so because a guard made an off-handed comment regarding the appellant's plan to seek two-for-one confinement credit for his time in PTC. After considering all of the evidence, the military judge found that the searches in the brig were conducted for safety, welfare, and health concerns, and that reading the appellant's correspondence was not improper.

> [S]earches are conducted in the brig . . . [and] are done randomly. Not every cell everyday but every three days or so is reasonable. The searches include the CO's office. It is appropriate to search confidential envelopes, including those labeled "attorney-client privilege," for contraband. They are not exempted from search by any regulation. When searched, the contents are not supposed to be read but only [scanned] to see if they contain contraband that would affect safety and welfare, etc. Some facilities do read the contents, but that is not the practice here[.][69]

The military judge's ruling makes no finding regarding where the guard got his information concerning the appellant's plan to seek two-for-one confinement credit. The only evidence on this subject was the appellant, who claimed the guard could only have gleaned this information from reading his correspondence with his counsel. If the appellant's claim is true, confidential matters learned from a search of such materials should be protected to the greatest extent possible. If the guard's off-handed comment to the appellant was a result of learning the information from any privileged source, it was certainly improper.

Assuming, *arguendo*, there was a breach of the appellant's attorney-client privilege and statement, and thus an Article 13, UCMJ, violation, the appellant has the burden to demonstrate any material prejudice. The appellant has failed to demonstrate any material prejudice and is not entitled to any administrative credit. *See United States v. Villamil-Perez*, 32 M.J. 341, 342 (C.M.A. 1991) (finding a violation of Article 13, UCMJ, but awarding no confinement credit because of a lack of substantial prejudice to the appellant).

It is significant that the military judge found the policies and practices of the brig exemplary.

---

[69] *Id.* at 370. *See also id.* at 373, where the military judge defined scanning as "to read hastily."

[T]he brig began an accreditation audit process in March 2016 with the American Corrections Association [ACA], which is the gold standard for correction facilities in the United States. The audit concluded in July 2016. In August 2016 [the month before the appellant argued his motion], the brig became the first [Department of Defense facility outside of the continental United States] to meet the ACA standards. The brig received 100 on all 540 standards[,] including those for medical care[.][70]

In denying the motion, the military judge concluded that although the treatment experienced by the [appellant] may have been uncomfortable and/or unpleasant, "none of the conditions of which the [appellant] complains has been shown to be sufficiently egregious as to give rise to a permissive inference that the [appellant] is being punished or that they are so excessive as to constitute punishment."[71]

We agree with the military judge's conclusions, and none of his findings are clearly erroneous. The appellant has failed to establish that he was subjected to pretrial punishment in violation of Article 13, UCMJ.

## C. Court-martial order scrivener's error

Although not raised by the parties, we note that the court-martial order explains withdrawn specifications with a footnote that incorrectly states that "Pursuant to pretrial agreement . . . Charge IV and its sole specifications [sic] were withdrawn . . . ."[72] In fact, the appellant pled guilty to Charge IV and its sole specification. The footnote should reflect that "Charge V and its two specifications were withdrawn . . . ." This fact is reflected in the record[73] and in other sections of the court-martial order.[74] We test error in court-martial orders under a harmless-error standard, *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998), and find this error did not materially prejudice the appellant's substantial rights. However, the appellant is entitled to accurate court-martial records. *Id.* Accordingly, we order the necessary corrective action in our decretal paragraph.

## III. Conclusion

The findings and sentence are affirmed. The supplemental court-martial order shall reflect that, pursuant to the PTA, Charge V and its two

---

[70] *Id.* at 370.

[71] *Id.* at 372.

[72] CA's Action of 23 Dec 2016.

[73] Record at 265.

[74] CA's Action at 7-9.

specifications, not Charge IV and its sole specification, were among the charges and specifications withdrawn and dismissed without prejudice to ripen into prejudice upon completion of appellate review.

Senior Judge MARKS and Judge WOODARD concur.

For the Court



R.H. TROIDL
Clerk of Court